**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH A. SETCAVAGE,      )
                                )
         Plaintiff,          )
                                )     Civil Action No. 05- 118 Erie
                                )
          v.               )
                                )
JO ANNE BARNHART,        )
Commissioner of Social Security,  )
                                )
         Defendant.      )

**<u>MEMORANDUM OPINION</u>**

McLAUGHLIN, J.

      Plaintiff, Joseph A. Setcavage, commenced the instant action pursuant to 42 U.S.C. §§

405(g) seeking judicial review of the final decision of the Commissioner of Social Security

denying his application for disability insurance benefits ("DIB") under Title II of the Social

Security Act, 42 U.S.C. § 401 *et seq*.  Plaintiff filed an application for DIB on March 18, 1999,

alleging that he had been unable to work since April 2, 1997, due to a bad back and Dupuytren's

contractures in his right hand (Administrative Record, hereinafter "AR", 101-103, 147).  His

application was denied initially and on reconsideration (AR 49-51).  A hearing was held before

an administrative law judge ("ALJ") on January 10, 2001 (AR 488-513).  Following this hearing,

the ALJ found that he was not entitled to a period of disability or disability insurance benefits

under the Act (AR 56-62).  On November 20, 2002, the Appeals Council granted his request for

review, vacated the unfavorable decision, and remanded the case to the ALJ for further

administrative proceedings (AR 98-100).

      A second hearing was held before the ALJ on April 9, 2003 (AR 514-526).  On May 15,

2003, the ALJ again found that Plaintiff was not entitled to a period of disability or disability

insurance benefits under the Act (AR 21-28).  Plaintiff's request for review by the Appeals

Council was denied (AR 8-11), rendering the Commissioner's decision final under 42 U.S.C. §

405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are

1

cross-motions for summary judgment.  For the reasons set forth below, we will grant the Defendant's motion and deny the Plaintiff's motion.

## I. BACKGROUND

Plaintiff was born on June 10, 1948, and was fifty-four years old at the time of the second hearing (AR 22, 101).  He has a high school education, and past relevant work experience in electrical-mechanical maintenance and assembly work (AR 22, 491-493).

Plaintiff has a history of low back pain (AR 311).  On April 22, 1997, Plaintiff was seen by Peter Wilczanski, M.D., for complaints of severe back pain as the result of injuring himself by turning a heavy motor that was on a pivot (AR 361).  Dr. Wilczanski noted that Plaintiff was in significant discomfort, had tenderness to palpation over the right area, straight leg raise testing was positive bilaterally, about twenty degrees on the left and ten to fifteen degrees on the right (AR 361).  Plaintiff was unable to elevate his legs while lying down and was unable to walk on his heels (AR 361).  He was able to walk on his toes but not without pain, and had intermittent numbness and tingling (AR 361).  Dr. Wilczanski diagnosed severe exacerbation of sciatica and degenerative disc disease of the lumbar spine (AR 361).  He ordered an MRI and referred Plaintiff to David McGee, M.D. (AR 361).

Plaintiff underwent an MRI conducted on April 25, 1997 (AR 366).  Results revealed asymmetry in the L4-5 intervertebral disc, resulting in a likely mild right lateral recess and inferior foraminal narrowing; mild right foraminal narrowing on the right L5-S1, and degenerative disc changes of L4-5, L3-4, and L5-S1 (AR 366).

On May 31, 1997, Plaintiff was evaluated by David M. McGee for complaints of back pain (AR 461).  On physical examination, Plaintiff could stand on his tiptoes, had fair dorsiflexion and plantar flexion, some increased right low back pain on straight leg raise testing, fair adduction and abduction at knee level, and fair quadriceps and hamstring strength (AR 461).  Dr. McGee diagnosed Plaintiff with work trauma superimposed on already present multilevel degenerative changes at L3-4, L4-5, and L5-S1, and some right lubosacral nerve root irritative

symptoms, improving (AR 461).  He recommended pool therapy, anti-inflammatories, and a formal functional capacities evaluation prior to returning to work (AR 461).

On July 24, 1997, Dr. Wilczanski gave Plaintiff permission to return to work with the restrictions of no lifting more than twenty pounds, no prolonged standing of more than half an hour at a time, and no bending (AR 360).

On September 30, 1997, Plaintiff complained of some pain in his buttocks and lower left extremity, but stated that it was not as bad as it had been and pool therapy was very helpful (AR 359).  He reported that he was still off work because there were no jobs compatible with his restrictions, but he was contemplating returning to work since his symptoms were not as bad (AR 359).  Straight leg raise testing was positive at sixty degrees bilaterally with some buttock pain, reflexes were normal, and he was able to heel and toe walk (AR 359).  Dr. Wilczanski opined that he could return to work with the following restrictions: no repetitive, frequent bending, no lifting over thirty pounds, and no prolonged standing over one hour at a time (AR 359).

Plaintiff underwent a functional capacity evaluation performed by a physical therapist on October 24, 1997 (AR 385-388).  The physical therapist opined that he could return to work at the light physical demand level (AR 399).

On December 4, 1997, Plaintiff was evaluated by John C. Lyons, M.D., for complaints of low back and left buttock pain (AR 390-395).  On physical examination, Dr. Lyons noted that Plaintiff moved fluidly in the office and got on and off the examination table well (AR 391).  Dr. Lyons reported that Plaintiff's back was nicely aligned, he was very tight in the hamstrings, and he was able to side bend very well (AR 391).  Plaintiff had reproduction of discomfort in the L4-5, S-1 region on extension, and some soreness over the left SI joint (AR 391).  His muscle sensory reflexes in his lower extremities were within normal limits, he had no atrophy, and he was able to heel and toe walk (AR 391).

Dr. Lyons assessed Plaintiff with degenerative disc disease in the lumbar spine at L3-4, L4-5, and L5-S1, with no neurologic deficits suggestive of any disc herniation or neurologic

impingement (AR 393).  He noted that Plaintiff felt his April 2, 1997 inflammation was resolved, and treatment records indicated that other transient episodes of back pain had resolved (AR 393). Dr. Lyons indicated that Plaintiff's recurrent episodes were not tied to a single event, but rather a degenerative process, and future episodes of inflammation would occur whether at work, home or other locations (AR 394).  Dr. Lyons opined that Plaintiff could return to work and would not necessarily need restrictions (AR 394).  He felt that Plaintiff could engage in medium level work as long as he was careful in his motions and his leverage (AR 394).  Dr. Lyons further opined that his degenerative disc disease could be expected to progress, but such a possibility existed with or without an employment option, and he did not expect that his duties would change the natural history of his disease (AR 394-395).

On December 18, 1997, Plaintiff reported to Dr. Wilczanski that his back felt significantly better, but he still had problems with reaching forward, reaching overhead, pushing, and squatting (AR 358).  Dr. Wilczanski concurred with the results of the October 1997 functional capacity evaluation (AR 358).

On February 10, 1998, Nancy Carpenter, M.D., a state agency reviewing physician, reviewed Plaintiff's medical records and completed a residual functional capacity assessment (AR 462-469).  Dr. Carpenter opined that Plaintiff was capable of performing light work which required no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling (AR 464).

On June 1, 1998, Plaintiff complained of problems with his right hand, reporting tightness, decreased range of motion, some pain, and thickening of the tendon (AR 357). Examination of his right hand revealed signs consistent with typical Dupuytren's contracture (AR 357).[1]  Plaintiff reported that since his symptoms had worsened, he would be open to invasive treatment options (AR 357).  Dr. Wilczanski referred him to John Lubahn, M.D., for surgical

---

[1]Dupuytren's contracture is a condition whereby the contracture of the palmar fascia causes the ring and little fingers to bend into the palm so that they cannot be extended. *See Taber's Cyclopedic Medical Dictionary,* D-69 (13th Ed. 2001).

4

treatment (AR 357).

Dr. Lubahn evaluated Plaintiff on June 9, 1998 for complaints of a gradual contracture of the fingers of his right hand (AR 408). On physical examination, Dr. Lubahn observed that he had thickening of the long, ring and small finger rays, but the MP joints could be fully extended (AR 408). There was a forty degree boutonniere deformity of the PIP joint of the small finger which could be passively corrected and was not symptomatic (AR 408). His grip and pinch strengths and sensory evaluation was satisfactory (AR 408). Dr. Lubahn assessed Plaintiff with fairly significant Dupuytren's disease with a boutonniere deformity of the small finger with no evidence of contracture in the long, ring or small finger (AR 408). He administered an injection and ordered a night splint to be worn to prevent and protect his right hand and to prevent the contracture from worsening (AR 408).

On July 28, 1998, David Turok, M.D., a neurologist, reviewed Plaintiff's medical records pursuant to the request of his employer to determine his ability to perform work duties (AR 374-377). Dr. Turok reviewed the diagnostic studies and treatment notes, and concluded that Plaintiff could engage light duty work, but could not perform any significant lifting or do any activities that would put severe stress or strain on his lower back (AR 375). He opined that Plaintiff could sit for eight hours with a sit/stand option; stand for four hours with a sit/stand option; walk for four hours for short distances; lift and carry twenty pounds occasionally and ten pounds frequently; occasionally push/pull up to fifty pounds; occasionally bend and twist; and had no restrictions in his upper and lower extremity use (AR 376).

Plaintiff returned to Dr. Lubahn on August 7, 1998, who reported that Plaintiff had difficulty closing his palm flat on a tabletop (AT 407). Since Plaintiff had not responded to his previous steroid injection, Dr. Lubahn felt that he was a good candidate for a fasciectomy (AR 407). He reported to Dr. Wilczanski that Plaintiff would be off work between six and twelve weeks following the procedure (AR 407).

On September 17, 1998, Plaintiff underwent an open palmar fasciectomy of his right hand

(AR 412). One day later, his wound was clean and dry, and he was instructed in a range of motion program and given an orthoplast splint to hold his fingers in extension (AR 406). On September 25, 1998, Dr. Lubahn reported that he was tolerating his splint well (AR 405).

On October 30, 1998, Dr. Lubahn found that his wound was completely healed, although he had moderate erythema and thickening of the scar site (AR 404). Plaintiff declined a steroid injection, and indicated that he had not been taking his ibuprofen (AR 404). Dr. Lubahn stressed the importance of taking ibuprofen, and recommended an injection in two to three weeks if the erythema and thickening did not subside (AR 404).

Plaintiff returned to Dr. Lubahn on November 20, 1998, who noted that his grip and pinch strength remained somewhat diminished, particularly on the right (AR 403). The erythema was less in his palm, and better controlled with ibuprofen (AR 403). Dr. Lubahn stressed the importance of continuing the ibuprofen (AR 403).

On December 30, 1998, Plaintiff complained of acute lower back pain after twisting his back (AR 356). He was unable to perform any range of motion tests due to severe pain, straight leg raise testing was positive in the back at thirty degrees bilaterally, but sensation was intact bilaterally (AR 356). He was assessed with severe spasm of the lumbosacral spine (AR 356).

On January 26, 1999, Dr. Lubahn completed a physical capabilities statement (AR 370-371). Dr. Lubahn opined that Plaintiff could return to work that did not require the repetitive use of his hands (AR 370). He further opined that he had no restrictions in sitting, standing or walking; could occasionally lift/carry up to nineteen pounds, and frequently lift/carry up to nine pounds; frequently bend, stoop, crouch, reach, and squat; could never climb; and could occasionally drive, kneel, use his hands repetitively, and use his hands and arms (AR 371). Dr. Lubahn indicated that any limitations due to Plaintiff's back injury would have to be addressed by his treating doctor (AR 370).

On February 19, 1999, Plaintiff complained of mild dysesthesia in his hand (AR 402). Dr. Lubahn noted tenderness over the distal metacarpal heads, and pain and swelling in the PIP

joint of the ring finger (AR 402).  Radiographs showed no significant osteoarthritic change, and his range of motion was satisfactory (AR 402).  Dr. Lubahn recommended that Plaintiff continue his range of motion and stretching exercises, and continue taking ibuprofen (AR 402).

Plaintiff returned to Dr. Wilczanski on February 26, 1999 complaining of low back pain (AR 354).  He requested Naprosyn, since it helped him quite well in the past (AR 354).  On physical examination, Plaintiff exhibited a "little bit" of tenderness in the left buttock area, straight leg raise testing was positive at forty degrees on the left and negative on the right, and no neurological deficits were present (AR 354).  Dr. Wilczanski diagnosed him with chronic degenerative disc disease of the lumbosacral spine with flare up of radicular symptoms (AR 354).

On April 30, 1999, Dr. Lubahn reported that Plaintiff could use his right and left hands to pick up a coin from a flat surface; fasten buttons and snaps; turn pages of a book; open jars; tie shoes; put on clothing; lift small objects; open doors and drawers; dial a telephone; and use push buttons (AR 415).

On May 13, 1999, Nghia Tran, M.D., a state agency reviewing physician, completed a residual functional capacity assessment (AR 416-423).  Dr. Tran reviewed the medical evidence of record and concluded that Plaintiff was capable of performing light work (AR 417-423).

On May 21, 1999, Plaintiff was seen by Dr. Lubahn, and reported moderate tenderness in his right palm (AR 459).  Dr. Lubahn reported that there was a moderate amount of persistent thickening and redness at the incision site, but that his contracture had not recurred (AR 459).  A cortisone injection was administered (AR 459).

On August 13, 1999, Dr. Lubahn reported that there had been no change in Plaintiff's condition since April 1999, but he had not seen Plaintiff since May 1999 (AR 414).

Plaintiff was evaluated by David M. Babins, M.D., on July 30, 1999 for complaints of back pain (AR 424-425).  Dr. Babins noted that he walked relatively well and walked adequately on his heels and toes (AR 424).  While standing, Plaintiff was able to forward flex to sixty degrees, extend to fifteen degrees, and rotate forty degrees in either direction (AR 424).  Deep

tendon reflexes were 1 + and symmetrical, and his sensory examination was diminished in the left L3 dermatome (AR 424-425).  Motor examination showed no evidence of focal weakness in the L3, L4, L5 or S1 dermatomes (AR 425).  Straight leg raise testing on the right reproduced back pain on the left and buttock pain (AR 425).  An x-ray of Plaintiff's lumbar spine showed potentially significant degenerative disc disease at the lower lumbar levels (AR 426).

Dr. Babins opined that Plaintiff manifested signs and symptoms of degenerative disc disease, diffusely, as well as mild lumbar instability (AR 425).  He concluded that Plaintiff was capable of performing work duties that did not require repetitive bending or twisting, or prolonged standing (AR 425).  He further indicated that Plaintiff would need to sit frequently (AR 425).

On August 20, 1999, Dr. Lubahn evaluated Plaintiff for pain in his right palm (AR 458).  He noted tenderness between the thumb and index finger and along the radial side of the thumb (AR 458).  Since Plaintiff had not benefitted from cortisone injections, Dr. Lubahn recommended iontophoresis and continued ibuprofen (AR 458).

Plaintiff returned to Dr. Lubahn on October 1, 1999 complaining of right palm discomfort which was aggravated by finger extension (AR 457).  Dr. Lubahn reported that radiographs showed a moderate degree of osteoarthritic change, and he recommended injection therapy (AR 457).  He was of the opinion that Plaintiff's symptoms were due to recurrent aggressive fibromatosis, and that regular ibuprofen was important, as well as splinting and stretching (AR 457).  Dr. Lubahn reported that Plaintiff was following the program well (AR 457).

Plaintiff was evaluated by John C. Kalata, D.O., on October 5, 1999 pursuant to the request of the Commissioner (AR 427-433).  Dr. Kalata reported that Plaintiff noticeably walked with a limping and antalgic-type gait (AR 427).  On physical examination, Dr. Kalata reported that Plaintiff's right hand showed flexor deformity of the middle two fingers and the fifth finger (AR 429).  Plaintiff could not perform fine movements with his hand but he still had pronation and supination (AR 430).  Straight leg raise testing was held at seventy-five degrees which

8

produced back pain (AR 429).  Plaintiff's motor power was fully intact and his reflexes adequate (AR 430).  Dr. Kalata diagnosed discogenic disease of the lumbar spine at L3-4, L4-5, and L5-S1; left lower leg neuritis; lumbar muscular instability; Dupuytren's contracture of the right hand with flexor deformities of the third and fourth fingers; hypertension at 160/110; ethanolism, mild; and ambulatory dysfunction (AR 430).  Dr. Kalata opined Plaintiff could occasionally lift and carry two to three pounds; stand one hour or less; had no limitation in sitting; was limited in his pushing and pulling ability; could occasionally bend, kneel, and climb; could never stoop, crouch or balance; and was limited in his handling, fingering and feeling ability (AR 433).

On October 20, 1999, Jay Newberg, M.D., a state agency reviewing physician, completed a residual functional capacity assessment (AR 434-441).  Dr. Newberg reviewed the medical evidence of record and concluded that Plaintiff was capable of performing sedentary work (AR 434-441).

On December 14, 1999, Perry Grossman, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Dr. Tran's limitations were more appropriate than Dr. Kalata's limitations (AR 442-445).

On January 25, 2000, K. Loc Le, M.D., a state agency reviewing physician, completed a residual functional capacity assessment and opined that Plaintiff could perform light work that required no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling (AR 446-453).

On January 28, 2000, Plaintiff was seen by Dr. Lubahn, who reported that Plaintiff had done an excellent job of maintaining finger extension (AR 456).  He further reported that Motrin had afforded Plaintiff some relief and had minimized the inflammation (AR 456).  Since he still had a moderate degree of discomfort, Dr. Lubahn recommended Celebrex (AR 456).

Plaintiff returned to Dr. Lubahn on July 5, 2000, for follow-up of pain and fibromatosis in his right palm (AR 455).  Dr. Lubahn reported that his range of motion remained reasonably good, but he had pain over the palmar side of the hand between the thumb and index finger (AR

455).  He recommended regular nonsteroidal medication in the form of Celebrex, and considered injections if his symptoms did not subside (AR 455).

On September 6, 2000, Plaintiff continued to complain of pain in his right hand at the basal joint of his thumb (AR 477).  Dr. Lubahn reported that his range of motion remained somewhat limited and a relatively thick scar was present, and radiographs showed mild trapeziometacarpal joint arthritis (AR 477).  Dr. Lubahn preferred to treat him non-operatively, and administered a Depo-Medrol injection (AR 477).  Plaintiff also reported a lesion on the plantar surface of his foot (AR 477).

On September 30, 2000, Dr. Lubahn completed a disability statement for Plaintiff's employer, and opined that he was totally disabled for any occupation due recurrent Dupuytren's which could result in surgery (AR 473).

On November 21, 2000, Plaintiff was seen by Dr. Lubahn for palmar fibromatosis bilaterally as well as plantar fibromatosis (AR 471).  Dr. Lubahn reported that Plaintiff's right hand was most symptomatic, but had not worsened, and he received some relief with Vioxx  (AR 471).  He recommended continued use of Vioxx and use of good shoe wear for his plantar fibromatosis (AR 471).

On September 18, 2001, Dr. Lubahn wrote Dr. Wilczanski a letter and reported that Plaintiff continued to complain of a moderate degree of pain with extension of the small finger of his right hand (AR 485).  His grip and pinch strength was in the fifty pound per square inch range, and there was no dysesthesia over the scar in his palm (AR 485).  He reported that in addition to Plaintiff's Dupuytren's disease, the condition also involved the plantar surfaces of his feet with frequent episodes of itching and nodular change (AR 485).  Dr. Lubahn further reported that Plaintiff continued to require treatment for Type 2 diabetes, essential hypertension, "disc disease in his hand" and required a hearing aid (AR 485).  He opined that he still felt Plaintiff qualified for total disability (AR 485).

On June 5, 2002, Dr. Lubahn reported that Plaintiff continued to complain of moderate

aching and discomfort in the right hand (AR 483).  He noted there had been some progression of his Dupuytren's disease, particularly into the first web space (AR 483).  Plaintiff was still able to place his hand flat-palm on a tabletop, although he had a persistent forty to forty-five degree flexion contracture of the PIP joint (AR 483).  Dr. Lubahn discussed additional treatment options with Plaintiff, which included a steroid injection or collagenase injection, and failing these options, possible segmental apponeuresectomy (AR 483).  He recommended regular use of ibuprofen (AR 483).

On September 24, 2002, Dr. Lubahn reported that Plaintiff had PIP joint tenderness in the right small finger, with some pain noted with radial and ulnar stress, and radiographs showed mild osteoarthritic change (AR 481).  He recommended regular use of nonsteroidal medication, and if his pain continued, an interphalangeal joint arthrodesis (AR 481).

Finally, Plaintiff returned to Dr. Lubahn on November 12, 2002 for follow up (AR 479).  Dr. Lubahn reported that Plaintiff had mild erythema, left palm pain, and a less painful PIP joint contracture on the right (AR 479).  Plaintiff was to continue ibuprofen (AR 479).

Plaintiff and Joseph Kuhar, a vocational expert, and Dennis Agostini, a medical expert, testified at the first hearing held by the ALJ on January 10, 2001 (AR 488-513).  Plaintiff testified that he stopped working in April 1997 due to a work-related back injury (AR 493).  He received worker's compensation benefits, and also received long-term disability benefits through his employer (AR 494-496).  Plaintiff stated that he was unable to work due to lower back pain which radiated to his left buttock (AR 496).  He claimed he had trouble standing, walking and sitting, and at times his legs were numb (AR 496).  Approximately five times per month, he needed to lay down for about two hours to alleviate the pain, and at least once per week he soaked in a hot bath (AR 502-504).

Plaintiff further testified that his hands hurt due to his Dupuytren's disease, and he suffered pain when opening a bottle or holding a screwdriver (AR 497).  He was able to write, but not for long periods of time, and could handle change (AR 498-499).  Plaintiff also indicated

that he had a problem standing because the Dupuytren's disease affected his feet (AR 497). He was able to stand for about an hour, walk three blocks, but was unable to sit without leaning on something (AR 500-501). Plaintiff testified that he was able to read the paper, watch television, visit relatives, work on the computer, do the laundry, wash dishes, cook, and dress himself (AR 501, 505). Handling a comb was difficult, and his wife helped him tie his shoes (AR 505).

The medical expert testified that Plaintiff's impairments did not meet or equal any of the listings (AR 507). He further testified that he was familiar with the physical capacity definitions used by the Department of Labor, and opined that Plaintiff had a limited functional capacity (AR 507).

The vocational expert was asked to consider an individual of Plaintiff's age, education, and vocational background, who could occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand or walk four hours out of an eight hour day and sit for up to eight hours, but would need a sit/stand option (AR 510). He further asked the vocational expert to consider that this individual could only occasionally perform squatting, overhead reaching or forward reaching, could not engage in repetitive activity or repetitive use of the dominant right hand, and was restricted from activities that involved fine motor movement (AR 510). The expert testified that such an individual could perform the sedentary, unskilled jobs as a surveillance system monitor and gate guard (AR 510-511).

Following the hearing, the ALJ issued a written decision which found that Plaintiff was not entitled to a period of disability or disability insurance under the Act (AR 56-62). On November 20, 2002, the Appeals Council granted Plaintiff's request for review, vacated the unfavorable decision, and remanded the case to the ALJ for further administrative proceedings (AR 98-100).

On April 9, 2003, the ALJ held a second hearing, at which Plaintiff and Noel Plummer, a vocational expert, testified (AR 514-526). Plaintiff testified that his back condition was the same, but that his hand condition had worsened (AR 517). He claimed that it was "tough" to

grab things and hold things, and he had undergone surgery on his right hand (AR 517). He further testified that lesions on his feet caused pain while standing (AR 525-526).

The vocational expert was asked to consider an individual of Plaintiff's age, education, and vocational background, who was limited to light work with a sit/stand option at reasonable intervals; no more than fours hours of standing or walking per day; no more than occasional squatting or reaching overhead or forward; no repetitive use of his right dominant hand; and no use of either hand for fine motor movements, but could perform other postural activities normally associated with work (AR 522). The vocational expert testified that such an individual could perform the light, unskilled jobs as a production inspector/examiner, messenger or mail clerk (AR 523).

Following the second hearing, the ALJ issued a written decision which found that Plaintiff was not entitled to a period of disability or disability insurance under the Act (AR 21-28). Plaintiff's request for review by the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 8-11). He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that

they are unable to engage in any substantial gainful activity.  42 U.S.C. § 423(d)(1)(A).  In order

to be entitled to DIB under Title II, a claimant must establish that his disability existed before the

expiration of his insured status. 42 U.S.C. § 423(a), (c).  The ALJ found that Plaintiff met the

disability insured status requirements of the Act through December 31, 2002 (AR 27).

A person is "disabled" within the meaning of the Social Security Act if he or she is unable

to "engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a five-step evaluation process to determine when an individual meets

this definition:

> In the first two steps, the claimant must establish (1) that he is not
> engaged in "substantial gainful activity" and (2) that he suffers
> from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S.
> 137, 140-41 (1987).  If the claimant shows a severe medical
> impairment, the [Commissioner] determines (3) whether the
> impairment is equivalent to an impairment listed by the
> [Commissioner] as creating a presumption of disability. *Bowen,*
> 482 U.S. at 141.  If it is not, the claimant bears the burden of
> showing (4) that the impairment prevents him from performing the
> work that he has performed in the past. *Id.*  If the claimant satisfies
> this burden, the [Commissioner] must grant the claimant benefits
> unless the [Commissioner] can demonstrate (5) that there are jobs
> in the national economy that the claimant can perform. *Ferguson
> v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.  The ALJ resolved Plaintiff's case at the fifth step.  At step two, the

ALJ determined that his degenerative disc disease, with a superimposed occupational injury, and

Dupuytren's contractures were severe impairments, but determined at step three that he did not

meet a listing (AR 22).  At step four, the ALJ determined that he could not return to his past

relevant work, but retained the residual functional capacity to lift up to twenty pounds

occasionally; stand and/or walk up to four hours per day, but would need a sit/stand option at

reasonable intervals; could occasionally squat, reach overhead or forward, and could perform

other postural activities normally associated with work; but was not capable of repetitive use of

his dominant right hand or repetitive fine motor manipulation with either hand (AR 25).  At the

final step, the ALJ determined that he could perform the light jobs cited by the vocational expert at the administrative hearing (AR 26). The ALJ also determined that Plaintiff's allegations regarding his limitations were credible to the extent that they were not inconsistent with the adopted residual functional capacity (AR 27). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Plaintiff fundamentally takes issue with the ALJ's finding that he can perform light work with certain restrictions. He contends that this finding is contrary to his treating physicians' opinions and his testimony.

We first note that an ALJ must consider all relevant evidence when determining an individual's residual functional capacity. *See* 20 C.F.R. § 404.1545(a); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000). "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett,* 220 F.3d at 121, quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). Social Security Ruling ("*SSR*") 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*SSR* 96-5p (1996), 1996 WL 374183 *5.

Here, the ALJ found that Plaintiff could lift up to twenty pounds occasionally; stand and/or walk up to four hours per day, but would need a sit/stand option at reasonable intervals; could occasionally squat, reach overhead or forward, and could perform other postural activities normally associated with work; but was not capable of repetitive use of his dominant right hand or repetitive fine motor manipulation with either hand (AR 25).

Plaintiff argues that the ALJ failed to give controlling weight to the reports of his treating physician, Dr. Lubahn, and the consultative examiner, Dr. Kalata.  At the outset we note that it is true that an ALJ must give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record" *see* 20 C.F.R. § 404.1527(d)(2).  However, an ALJ may reject the opinion of a treating physician if it is "conclusory and unsupported by the medical evidence."  *Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991).  When medical testimony conflicts or is inconsistent, the ALJ is required to choose between them.  *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981).  In making that choice, a treating physician's conclusions are to be examined carefully and accorded more weight than a non-treating physician's opinion.  *Podedworny v. Harris*, 745 F.2d 210, 217 (3rd Cir 1984).  Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so.  *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Contrary to Plaintiff's contentions, we find that the ALJ considered Dr. Lubahn's opinions consistent with the above standards.  Dr. Lubahn, Plaintiff's treating physician, opined in September 2000 that Plaintiff was totally disabled for any occupation due to recurrent Dupuytren's which could result in surgery (AR 473).  In September 2001, he opined that he still felt Plaintiff qualified for disability (AR 485).  The ALJ declined to accord controlling weight to his opinions, in part, since they were on an issue reserved to the Commissioner (AR 25).  We find no error in this regard.  "The ultimate decision concerning the disability of a claimant is reserved for the Commissioner."  *Knepp v. Apfel,* 204 F.3d 78, 85 (3rd Cir. 2000).  The pertinent regulations provide that opinions on some issues, including the opinion of whether a claimant meets the statutory definition of disability (i.e., is "disabled" or "unable to work") are not medical opinions "but are, instead, opinions on issues reserved to the Commissioner because

they are administrative findings that are dispositive of a case. ...” 20 C.F.R. § 404.1527(e).

The ALJ also found that Dr. Lubahn's opinion was purely conclusory and without any supporting explanation or rationale, and was similar to form reports in which a physician's obligation was only to check a box or fill in a blank (AR 25). The ALJ additionally found that his opinion could not be reconciled with his earlier expression of Plaintiff's functional capacity (AR 25). A relevant factor in determining whether a treating physician's opinion is entitled to great weight is the degree to which his opinion is supported by an accompanying explanation, and upon review of Dr. Lubahn's opinion, we find that the ALJ's determination in this regard is supported by substantial evidence. 20 C.F.R. § 404.1527(d)(3). Dr. Lubahn's opinions of disability were inconsistent with the medical evidence, including Dr. Lubahn's prior opinions relative to Plaintiff's functional capacity. In January 1999, Dr. Lubahn concluded that Plaintiff could return to work that did not require the repetitive use of his hands (AR 370). He further opined in April 1999 that Plaintiff could use his right and left hands to pick up a coin from a flat surface; fasten buttons and snaps; turn pages of a book; open jars; tie shoes; put on clothing; lift small objects; open doors and drawers; dial a telephone; and use push buttons (AR 415).

Moreover, there is no evidence that Plaintiff's hand condition deteriorated between Dr. Lubahn's 1999 opinions and his 2000 opinions. In January 1999, Dr. Lubahn reported that Plaintiff had done an excellent job of maintaining finger extension (AR 456). In July 2000, Plaintiff's range of motion was reported as reasonably good (AR 455). In June 2002, Dr. Lubahn reported that there had been some progression of his Dupuytren's disease, but Plaintiff was still able to place his hand flat-palm on a tabletop (AR 483). In September 2002 and November 2002, Dr. Lubahn continued to recommend regular use of ibuprofen as opposed to surgical intervention (AR 479, 481).

Plaintiff also challenges the ALJ's evaluation of Dr. Kalata's opinion, a consultative examiner who examined Plaintiff pursuant to the request of the Commissioner. Dr. Kalata concluded in October 1999 that Plaintiff could occasionally lift and carry two to three pounds;

stand one hour or less; had no limitation in sitting; was limited in his pushing and pulling ability; could occasionally bend, kneel, and climb; could never stoop, crouch or balance; and was limited in his handling, fingering and feeling ability (AR 433). Plaintiff claims in essence that Dr. Kalata's opinion negates his ability to perform light work and that the ALJ's reliance on a non-examining state agency physician's opinion was in error.

We note that the treating physician rule does not apply to a consulting physician's opinion. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3rd Cir. 1993) (doctrine had no application to physician who examined claimant once). Nonetheless, the Commissioner's regulations do acknowledge that, as a general principal, opinions from examining sources are given more weight than opinions from non-examining sources. *See* 20 C.F.R. 416.927(d)(1). The regulations do not require however, that in every case, an examining physician's medical opinion must be favored over that of a non-examining physician.

Here, the ALJ considered Dr. Kalata's reported findings based upon his physical examination of Plaintiff, and noted that his opinion conflicted with two state agency physicians' opinions, who found that he was capable of light work (AR 25). The ALJ placed more weight on the state agency physicians' findings since they were more consistent with the objective evidence. We find no error in this regard. Dr. Kalata's physical examination of Plaintiff was essentially unremarkable. Dr. Kalata reported that Plaintiff's motor power was fully intact and his reflexes were adequate (AR 430).

Moreover, we note that the ALJ did not solely rely on the state agency reviewing physicians' opinions in rejecting Dr. Kalata's opinion. The ALJ also found that Dr. Kalata's opinion conflicted with the opinions of Drs. Turok and Babins (AR 25). Dr. Turok, a neurologist, reviewed Plaintiff's diagnostic studies and treatment notes and concluded that he could engage in light duty work, but could not perform any significant lifting or any activity that would put severe stress or strain on his back (AR 375). Dr. Babins, one of Plaintiff's treating physicians, performed a physical examination of Plaintiff, and opined that he was capable of

18

performing duties that did not require repetitive bending or twisting, or prolonged standing, and

that he would need to sit frequently (AR 425).

The ALJ concluded that Dr. Kalata's opinion was inappropriately restrictive and

inconsistent with the state agency physicians' opinions, as well as the thorough evaluation of Dr.

Babins, one of Plaintiff's treating physicians.  Since the ALJ analyzed the medical evidence

consistent with the required standards, we conclude that substantial evidence supports the ALJ's

decision not to give Dr. Kalata's opinion controlling weight.

Plaintiff additionally claims that there is an alleged inconsistency in the ALJ's description

of his RFC when compared to the definition of light work set forth in the regulations.  Light work

is defined in the regulations as follows:

> Light work involves lifting no more than 20 pounds at a time with
> frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this
> category when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls.  To be considered capable of
> performing a full or wide range of light work, you must have the
> ability to do substantially all of these activities.  If someone can do
> light work, we determine that he or she can also do sedentary work,
> unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).  Light work "generally requires the ability to stand and carry weight for

approximately six hours out of an eight hour day."  *See Fargnoli v. Massanari*, 247 F.3d 34, 40

(3rd Cir. 2001).  Thus, in order to perform the full range of light work, the claimant must have the

ability to do substantially all of those activities described in the regulations, including the

prolonged standing and walking of up to six hours during the workday.  *See Stundard v.*

*Secretary of Health and Human Services*, 841 F.2d 57, 61 (3rd Cir. 1988).

Plaintiff argues that because the ALJ concluded that he was only able to stand and/or

walk for up to four hours, light work is precluded.  Plaintiff's argument however, misses the

mark.  The ALJ did not conclude that Plaintiff could perform a *full range* of light work.  To the

contrary; the ALJ found that Plaintiff could perform a *limited range* of light work, i.e., he could

lift up to twenty pounds occasionally; stand and/or walk up to four hours per day with a sit/stand option at reasonable intervals; could occasionally squat, reach overhead or forward, and could perform other postural activities normally associated with work; but was not capable of repetitive use of his dominant right hand or repetitive fine motor manipulation with either hand. "There is nothing oxymoronic in finding that a plaintiff can perform a *limited* range of light work[;] [s]uch a finding is appropriate where ... the evidence shows that the plaintiff can perform some, though not all, of the exertional requirements of a particular range." *Santiago v. Barnhart*, 367 F. Supp. 2d 728, 733 (E.D.Pa. 2005); *see also Boone v. Barnhart*, 353 F.3d 203, 210 (3rd Cir. 2003) (noting that plaintiff's RFC did not fall neatly into either the sedentary or light category; thus the ALJ found that plaintiff could do a limited range of light work). We therefore find no error in this regard.

Plaintiff also challenges that ALJ's credibility determination. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983).

Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence since the only evidence referenced by the ALJ in discrediting his testimony was a statement that Plaintiff's back impairment was work-related and he only received a modest workers' compensation payment. We disagree. Contrary to Plaintiff's argument, the ALJ did not rely solely on this evidence; he also concluded that Plaintiff's statements were not entirely

credible in light of the findings made on examination and the documentary treatment records (AR 23).  We find no error in the ALJ's credibility assessment.

With regard to Plaintiff's hands, the objective medical evidence demonstrates that although Plaintiff suffered from Dupuytren's contractures, he did not have any disabling functional limitations.  Dr. Lubahn opined that he could return to work that did not require the repetitive use of his hands, and he was able to pick up a coin from a flat surface; fasten buttons and snaps; turn pages of a book; open jars; tie shoes; put on clothing; lift small objects; open doors and drawers; dial a telephone; and use push buttons (AR 415).  In January 2000, Dr. Lubahn reported that Plaintiff had done an excellent job of maintaining finger extension (AR 456).  In November 2002, Plaintiff was still able to place his right palm flat on a tabletop (AR 483).  Plaintiff himself testified that he could write, although not for long periods of time, and could handle change (AR 498-499).

With respect to Plaintiff's back impairments, his treating physicians consistently opined that he could perform a limited range of light work despite his degenerative disc disease (AR 359, 394, 425).  Dr. Wilczanski concluded Plaintiff could work with the restrictions of lifting not more than twenty pounds, with no prolonged standing of more than half an hour at a time and no bending (AR 360).  Dr. Lyons concluded that Plaintiff could perform even medium work as long as he was careful in his motions and leverage, and opined that any work duties would not change the natural history of his disease (AR 394-395).  Dr. Babins concluded that he could perform duties that did not require repetitive bending or twisting, or prolonged standing, and allowed for frequent sitting (AR 425).  We therefore find that there was substantial evidence in the record, taken as whole, to support the ALJ's credibility determination.[2]

---

[2] We further reject Plaintiff's argument that the ALJ ignored evidence of his foot lesions. There is no medical evidence which demonstrates that Plaintiff's foot lesions resulted in any functional restrictions, and, as noted by the ALJ, Dr. Lubahn's letter to Dr. Wilczanski in September 2000 was focused exclusively on the problems associated with Plaintiff's hands (AR 24-25, 477).

Plaintiff finally challenges the ALJ's reliance on the vocational expert's testimony.  He argues that because the ALJ failed to question the vocational expert regarding conflicts or inconsistencies with the Dictionary of Occupational Titles ("DOT"), his reliance on the vocational expert's testimony was in error.  Notably, however, Plaintiff has not alleged that there is, in fact, an inconsistency or conflict in the jobs cited by the vocational expert and the DOT.  His real argument appears to be that he is incapable of performing the occupations identified by the vocational expert due to his functional limitations, claiming that because his treating and examining physicians rendered opinions which provided for no more than sedentary work, he should have been found disabled pursuant to the Medical Vocation Guideline 201.14.

We disagree.  The law is well established that "[w]hile the ALJ may proffer a variety of assumptions to [a vocational] expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments."  *Podedworny v. Harris*, 745 F.2d 210, 218 (3rd Cir. 1984).  In other words, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."  *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987), *citing, Podedworny, supra.  See also Wallace v. Secretary of Health and Human Services*, 722 F.2d 1150 (3rd Cir. 1983).  Because we have already determined that no error occurred in the ALJ's evaluation of the medical evidence and the ALJ's RFC determination was supported by substantial evidence, it was not error for the ALJ to rely on the vocational's expert's testimony.

## IV. CONCLUSION

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH A. SETCAVAGE,                )
                                    )
            Plaintiff,              )
                                    )        Civil Action No. 05- 118 Erie
                                    )
        v.                          )
                                    )
JO ANNE BARNHART,                   )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

## ORDER

AND NOW, this 29th day of March, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 18] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 19] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Joseph A. Setcavage.  The clerk is directed to mark the case closed.

                              s/ Sean J. McLaughlin
                              United States District Judge

cm: All parties of record.